The final case set for argument this morning is Bellesen v. Commisioner of Social Security, No. 20-2566. Mr. Osborne. Thank you, Your Honors. May it please the Court, my name is Daniel Osborne, and I represent the opponent in this case, Annie Bellesen. Our position is that Ms. Bellesen's case should be remanded for another administrative hearing because ALJ Berkowitz failed to give controlling weight to the opinions of Dr. Stanley Hertz, who treated Ms. Bellesen for more than seven years. We also submit that ALJ Berkowitz compounded his error when he failed to apply the Burgess factors. Those are the factors that are used to determine or that the party uses to explain why they didn't give controlling weight to a particular treating physician. The legal principle is very straightforward and well accepted. The opinion of a treating physician is given controlling weight if it is, one, well supported by medical findings, and two, not inconsistent with other substantial evidence. Let's look at those two criteria. The first being, was Dr. Hertz's, were Dr. Hertz's opinions well supported by medical findings? Again, as I noted, Dr. Hertz treated Ms. Bellesen from February 8th, 2011 through March 6th, 2018, just over seven years. I'm not going to go through the specifics, but I will tell you that the record is filled with sentence after sentence, paragraph after paragraph, and page after page of Dr. Hertz's treatment history, diagnoses, recommendations, drug prescriptions, medical source statements, a lot of, lot of information, and it was clear to him that Ms. Bellesen had severe mental health issues. Stiles, now let me ask you, the district court noted that the Burgess factors were not followed. A cited case law that says you can conduct a search and review of the record to see whether or not the conclusion, not getting it, controlling weight is supportable, and the district court spent several pages going through Dr. Hertz's records. So can you just, when the district court did that, was there a problem with respect to, for example, in March, 2014, the district court said Dr. Hertz noted that, you know, examination other than depressed mood, anxiety, and issues with attention span was unremarkable. As no, in April, 2014, no problem with activities of daily living. May, 2015, thought process logical and goal-oriented. So he's citing Dr. Hertz's records and suggesting that supported the conclusory statement by the ALJ. Can you address that with the district court missing other documents? Well, I think, you know, if you look back at the, these ALJ opinions, just by their very nature, are filled with the dates, doctor's names, opinions, and they don't necessarily just go in straight chronological order because they're looking at certain criteria that they have to comply with when they evaluate these cases. I think that if you look back at the treatment history, again, there's dates going all the way back to February, 2011, and all the way forward to March of 2018. We're talking about mental health problems here. And I think what happens is you don't necessarily, it's not like a broken leg, where when the person comes in, you see that there's a broken leg, and then if they get treated for it, you can see the progress that follows the rehabilitation. With mental health, you have snapshot days where everything is fine, and you have snapshot days where things are a complete disaster. I just get to one specific, I mean, so I agree we had to kind of hunt the record here. It's not well laid out in the ALJ decision. But in January of 2018, Dr. Hertz meets with your client. They discuss filling out a disability form sometime in the future. And then in the examination notes between January and March, it doesn't seem like there's, you know, really troubling findings by Dr. Hertz. He says consistently that her thinking is logical, her thought processes are goal-directed, she's not demonstrating unusual or atypical thoughts, no thoughts of self-harm or suicide, memory is good, concentration is normal. And then, you know, a few days later, March 6th, he marks boxes, and it's all just basically checking boxes for clinical findings of poor memory, difficulty thinking or concentrating, suicidal ideation, and persisting irrational fears. And that seems I think that that confirms that patients with mental health issues can appear relatively stable on one day and relatively unstable literally the next day. I'm not saying that's what happened here, but I think that you have to look at the records as a whole, and you're going to find days where there's no problems diagnosed, and you're going to have days where there are lots of problems diagnosed. So, I appreciate that, you know, there are certain days that are not necessarily favorable to Ms. Bellison in terms of putting diagnosis, but there are plenty of days where there are. The days that there are, I mean, you know, most of the findings that you're relying on are from 2014 and 2015. One would think the more relevant time period would be the, as you get closer to the final determination by Dr. Hertz, which is mostly, again, just checking boxes. Yeah, and one of the things I would have thought is that there would be more regular treatment, more visitations, more tests, and so forth. When you go through the calendar, it appears to be, you know, sometimes as much as six months in between. But again, I don't think that's not Dr. Hertz's fault. That's, you know, those are the days that she made the appointment and came in, or they were follow-ups. I thought that the gap was from the time that she was participating in kind of a semi-inpatient program, but otherwise she was seeing him on a relatively regular basis, almost monthly. Yes, monthly or bimonthly, exactly. It was pretty regular, and I think, you know, again, there are days where his report clearly identifies severe mental health problems, suicidal ideation, and things of that nature. It may be inconsistent with other days, but I think on the whole he found that she had severe mental health issues, and that's why he continued to treat her. So let me ask a question about her work history. It seems there's some indication that she worked on and off for a period of time, but it was unclear to me how long she worked or why her work was terminated. Did I just miss something in the record that would tell us about her capacity? It was concluded that her work history was not terribly relevant. She's a young person around, well, she was very young when the problem started back in 2008, 9, 10. So she had very little work history to... During the period of the treatment, so you would have thought that she might have been able to hold some kind of job. I do note that there's a record, and I don't have the exact date in my tongue, but there was a representation by Dr. Hertz that she was unable to... She had trouble keeping jobs because of her... And he uses that general, I think it's that general phrase exactly, that she has difficulty maintaining employment because of her mental health problems. So let me ask another question following up on my colleagues. It's conceded, basically, it's clear that the ALJ didn't consider all the Burgess factors and didn't give a recent analysis really about his decision to give, or her decision to give only some weight to Dr. Hertz's opinion as a treating physician. But as it's been pointed out, Judge Kogan did do a search and review and concluded at the end that the analysis established that despite her diagnosed mood disorders, it reflects many years of less than debilitating symptoms while acknowledging that she definitely had symptoms that were sometimes severe. What weight should we give Judge Kogan's decision? Given this procedural errors, have those been overcome by Judge Kogan's review, or is there some value to sending it back to the ALJ for a procedurally correct analysis and for stating good reasons for ignoring the treating physician's overall recommendation and evaluation? Well, I think that's sort of a variation on the question that Judge Sullivan asked. And his basis for remand all by itself. And I loved that part of Judge Kogan's opinion when I read his language where he questioned the appropriateness of the analysis. Then, of course, I was dismayed when I went forward and read that he thought he could found language that sort of cured that deficient analysis. I don't agree with that at all. And by the way, this is not a disability determination. This is simply a determination about whether the ALJ erred in his analysis. And, you know, we're not being asked to determine whether or not at this stage, Ms. Belson's disabled, we're simply looking at whether or not the ALJ erred. But I mean, for Halloran, I mean, we're allowed to, would you agree, to do a searching review of record to make sure that the treating physician rule isn't being violated? I mean, if the ALJ does a less than perfect job of articulating the basis for attaching less weight to the treating physician's findings, we're permitted then to go through the record ourselves to see if it can be justified. Do you agree with that? Is that the law? That's correct, Judge Sullivan, that you have the ability to do that. I would point out, and I see I'm well over my time, and I'll keep this short, but, you know, again, when you read these opinions from the ALJs, again, lots of dates, lots of doctors' names, lots of opinions. This case sort of stands out in my mind because, you know, the treating physician, Dr. Hertz, who cared for Ms. Belson for a little over seven years, and I understand there's some questions about, you know, how serious her conditions were and her symptoms and so forth, but the only contradicting evidence to his opinions, especially the parts where he found that there were mental health problems, the only contradictory evidence was Dr. Acer. Dr. Acer, on December 28, 2015, did a mental health statement and medical source had difficulty with other things. The ALJ gave her opinion great weight. Aside from that opinion, there's really nothing else over the seven years that disputes any of the adverse findings that Dr. Hertz found. Let me interrupt for just a second. Isn't there Dr. Gordon also did not evaluate her in person but said she had a mild limitation in certain abilities and moderate limitation in others? Yes, and that's why I was getting to that, because that report, her assessment is terribly troubling to me. On page four of ALJ Berkowitz's initial opinion, this is at the addendum at page four, this is the context of getting the opinion from Dr. Gordon. After reviewing Dr. Acer's examination report on March 20, 2018, two and a half years after it's written, Dr. Karen Gordon, a consultant psychiatrist, concluded that the claimant had moderate limitations of her ability to understand and remember complex instructions and a couple other things. In other words, Dr. Gordon's report was based on the reading two and a half years after it was prepared of Dr. Acer's report, and lo and behold, she came to the same conclusions. We've had cases where you have records that are reviewed by consultative physicians and reports are prepared from those records. I've never seen where a report was reviewed and then another doctor relied on that with their conclusions and their opinions. At the end of the day, I'm sorry, just one quick point here. At the end of the day, ALJ Berkowitz gave Dr. Gordon's opinion some weight, which is the exact same weight that he gave Dr. Hertz after seven years of treatment, and all this woman did was read a report. By the way, her report was really that she came up with was one of those check the box, basically, reports. I was very troubled by Dr. Gordon's opinion. Okay, thank you very much. We'll hear from Ms. Balaban. Good morning, your honors. My name is Rachel Balaban. I'm an assistant U.S. attorney in the Eastern District of New York on behalf of the commissioner. The district court properly upheld the commissioner's two decisions. One, that Bell-Henson was not entitled to child disability benefits, which I will note that the appellant appears to have abandoned on the appeal. I just want to note that is a decision that was part of an initial notice of appeal. The district court probably upheld that decision. The primary issue here is, did the district court probably upheld the commissioner's decision denying Bell-Henson supplemental security income benefits? We submit that the district court did properly uphold that decision. If I can address a couple of things. First, there is substantial evidence in the record for the ALJ's finding that Bell-Henson had the residual functional capacity to do simple tasks, low-stress work, with occasional interaction with others. In making that finding, the ALJ did take into consideration Bell-Henson's various mental impairments, but found, again, that she could perform simple tasks. That is consistent with the medical evidence in the record as a whole. Before you get to the substantial standard, procedurally, when you concede, as the district court correctly pointed out, that the Burgess factors were not followed, and that there is essentially one sentence, the opinions of Dr. Hirsch, however, were not consistent with the medical evidence, which supports a less severe degree of limitation, and then gives it a not great weight. That is not how it is supposed to work, right? Your Honor, we all submit that the ALJ, where it may not have been artfully organized, in fact, did address the Burgess factors. The ALJ, at the transcript 542, first noted that Dr. Hirsch was her treating psychiatrist and treated her over a prolonged period of time, and as Your Honor noted, did then note that there were inconsistencies. And doesn't note the inconsistency. It doesn't say, you know, I've read a lot of these ALJ opinions. They often will say, treating physician says X. Here's the objective evidence that's inconsistent with that. There was no side-by-side comparison of Dr. Hirsch's conclusions versus some contrary objective evidence, and that seems, you know, pretty important, right? Well, but I think what is very important as well, and I think you're right, that there was not a treatment note, but in pages 545 to 549 of the administrative record, five pages, the ALJ actually did a complete longitudinal analysis of Al Henson's medical treatment from 2011 and 2018. Let me give you an example. She does note on March 6, 2018, Judge Sullivan was referring to some of these. Dr. Hirsch stated that the claimant had markedly limited abilities to remember locations and work-like procedures, to understand and remember one or two-step instructions, to understand and remember detailed instructions. So, indicating obviously there's a significant problem there, and I was looking for what objective evidence contradicted them. What objective medical evidence contradicted those conclusions by Dr. Hirsch? Sure, sure, your honor. Well, if you, if for example, if we look at page 548 of the transcript, the ALJ talks, for example, about the January 2018 follow-up examination by Dr. Hirsch, which revealed similar findings that, other than the fact that she and had issues with her mood, her attention span, her concentration was normal, and her logical thinking was normal and goal-directed. And in fact, as the court is permitted to do on appeal, consistent with Halloran, if you look at Dr. Hirsch's treatment notes from 2012 to 2018, they consistently report that she had normal attention span, normal concentration, logical, goal-oriented thinking. Can I interrupt for a second? Can I interrupt for a second? I mean, this strikes me as such an inefficient way to do things. I mean, Burgess has decided in 2008, it's got clear standards as to what an ALJ has to consider if he or she is not going to give weight to the treating physician. I don't understand why the ALJ can't be expected to reference the standards explicitly and then to go through them explicitly, instead of requiring us or Judge Kogan to go hunting through the record. I mean, you've got three judges here, two lawyers here, Judge Kogan below. This strikes me as so unnecessary, and although it might be possible to do it, why do we want to reward this? Why don't we just send it out? You know, and I can't speak for why the ALJ organized his decision the way he did, but he did spend, again, five pages going through the chronological treatment of Bell-Henson. I'm sorry, but that's what's so frustrating about these when you read them. It is just this hodgepodge of cut and paste or copied language from reports that's given no context and is not directed towards an analysis, and then a completely conclusory statement about whether or not the ALJ is giving weight to the treating physician. It doesn't give one confidence that this has been done carefully or thoughtfully, and it shouldn't be that hard at this point, it seems to me. So what's the downside of sending this back and saying, do it right, look at the Burgess factors, point to us to the record as to where it is that you found Dr. Bell-Henson to be inconsistent with earlier findings? What's the downside of that? I would say that that's not consistent with this court's precedent. You know, first, including Brault and Chukoki, where the Second Circuit, this court has held that the ALJ does not need to state on the record every reason justifying the decision, and that the ALJ's decision can be affirmed if the record allows the court to glean the rationale of the ALJ. Do we have to do that? I guess that's my question. Does ASTREA require us to become ALJs? Does it require three of us to become ALJs? Well, not necessarily, Your Honor, but I would also submit that in accordance with this court's precedent, the burden is on the petitioner, the burden is on Bell-Henson to demonstrate that no reasonable fact finder would have If the procedure is poor, then, as Judge Sullivan pointed out, we can't be confident in the outcome. One thing that could also happen on remand would be that they could go back to Dr. Hertz and say, look, there's some inconsistencies in your analysis, and ask for a supplement to try to explain why that conclusion was reached, notwithstanding some good days and some bad days. Wouldn't that be helpful? Well, Your Honor, I think that the important distinction here is, is that there actually were no inconsistencies with Dr. Hertz's treatment notes. Pretty bad, right? There were ones, like on March 2018, where he's saying she's not functioning. There are ones, as Mr. Osborne pointed out, where she's having suicidal ideations. She's been treated for seven years. This is not a case where there's a couple of meetings or treatment sessions and, you know, this is seven years of treatment and some, you know, days that seem, you know, pretty debilitating to me. And I think that also, some very heavy-duty drugs prescribed and continually adjusted, reflecting a serious condition. Sure, no, and Dr. Hertz did note that, you know, he had prescribed drugs and the ALJ noted that as well. But I think the important distinction is, with respect to Judge Bianco's question, is that Dr. Hertz gave markedly different opinions. What I think Judge Bianco is referring to in March, those were his opinions, checkbox forms, and the like. But if you look at his treatment notes, we also try to lay out in our brief, he was consistent over that six, seven-year period, again, that she had normal attention span and logical thinking. This case is very different than, for example, this court's decision in Estrella. We're not dealing with, you know, the ALJ or we trying to, you know, cherry pick a treatment note or two that shows improvement. Here, there was continual, his treatment notes showed continual improvement over that period of time. There really are not any, if you look at the record, no discrepancies. Plus, it's substantiated by Dr. Acer's examination of her, plus the two consultative examiners who reviewed the record, Dr. Gordon, but also S. Shapiro. And further, if you look at the period of time when she was at St. Luke's, they also indicated that she had logical thought processes and could relate to others. And again, I also want to take a step back and highlight that the ALJ did not ignore that she had some mental impairments, but the ALJ did take into consideration those impairments in limiting her to, you know, very limited work, simple tasks, low-stress jobs, occasional interactions with others. So, those limitations were considered and incorporated by the ALJ. It wasn't ignored by the ALJ, but again, if the court does do a searching review of the record, which is consistent with Halloran, the record is clear that Bell-Henson could perform this work, again, had logical thinking, normal attention span. That is in the ALJ's decision, again, at pages 545 to 549, and it's in stark contrast, quite frankly, with the opinions Dr. Hertz was given. The opinions he gave were just wholly inconsistent with his treatment. And again, under the treating physician rule, controllingly is only given if it is well supported by the clinical findings, and his opinions are not supported by his very own clinical findings, and further, is inconsistent with the other substantial evidence in record. I also note that the court's recent case in Barrer v. Soule, 20-CV-1102, the court actually found there that the same psychiatrist, Dr. Hertz's conclusions, again, were not consistent with other evidence of the record, and the court found that the ALJ was permitted to afford his conclusions little weight. And this really is the same situation that we're dealing with here. His opinions were inconsistent with his own treatment notes, inconsistent with Dr. Acer, Dr. Gordon, S. Shapiro, certain of the treatment notes when she was at St. Luke's, even when she saw her own internist, Dr. Sampson, that there was only a couple of limited instances, but Dr. Sampson noted that when he saw her, she wasn't anxious. What are you implying about Dr. Hertz? Are you implying that Dr. Hertz is never reliable? No, not at all, Your Honor. I have no basis to say that. I'm just noting that if a treating physician's, again, opinion... Mental health issues are particularly difficult, as we noted in Estrella, and people have good days and bad days, and can look at a course of conduct over time, and course of treatment over time, and find what seem to be inconsistencies with relative ease. But I'm a little hesitant to draw too much from your pointing to Prera v. Saul, and the determination there to uphold the ALJ's finding of some inconsistencies in the record. It seems to be a different case. I recognize that, Your Honor. But again, I do want to also go back to Estrella, because I agree with you that mental illness is a difficult issue, and one that needs to be... You do need to look at the record as a whole. And I think the issue with Estrella was there were years that the ALJ didn't consider. The court found that there were years of treatment the ALJ didn't consider, didn't consider that she was on medication, and cherry-picked, so to speak, a couple of individual treatment notes. The problem here, again, as Judge Sullivan pointed out, and pardon me for interrupting, is that while there was a recitation, there wasn't an analysis. There was a conclusion announced at the end. And the failure, the procedural failure here really has meaningful substantive import. I think I agree with Judge Sullivan. I think that your referral to us of five pages of going through a kind of chronological exposition doesn't really tell us what the ALJ's reasoning was for ultimately rejecting Dr. Hertz's opinion. And that's my concern. But I take it you believe that it was more than conclusory. It was actually an analytical effort that deserved credit. I think we would submit that the longitudinal picture of the period of 2012 through 2018, showing, again, consistent normal attention span, logical thinking, that that speaks for itself, that it wasn't a matter of cherry-picking a note or two, that if you look at that entire picture, she could perform simple tasks and low-stress work as the ALJ found. All right. Thank you very much. I think we have your argument. We'll hear rebuttal. Thank you. Thank you, Your Honors. I'm troubled because in listening to Appellee's counsel, it appears that Dr. Hertz never noted a problem, never made any diagnosis about a mental health issue. Everything was fine. He just continued to treat or see her and there was no problem. When you look at the record, and I'll just jump right to April 2019, this is in our brief at page 13, Dr. Hertz completed a psychiatric evaluation on April 21, 2019. He reported that he last treated Ms. Bellison on March 26th, about a month before. Dr. Hertz opined that Ms. Bellison continued to have marked difficulties getting along with family and friends, displaying awareness of others' feelings, cooperating with others, including coworkers, holding a job, planning daily activities, paying bills, using public transportation, and initiating and participating in activities independent of supervision or direction. It says she has deficiencies in concentration, persistence in tasks, and so forth. There's a lot to digest in terms of Dr. Hertz's care and treatment of this woman. It's not as if all the pages are clean. The other thing that I think is interesting, Your Honors, is I just did this while Appellee's making her presentation. If you look at the ALJ's decision, I'm looking at page 5 of 12. It's at the addendum, page 5. There are paragraphs, multiple paragraphs, in succession where he concludes, he states multiple times within a paragraph, for the reasons noted above blank. For the reasons noted above blank. That's four times in one paragraph, four times in the following paragraph. I think we've seen all that, and it's frustrating. And I guess one could accuse the ALJ of what we might refer to as procedural error. I guess the question is, has Judge Kogan effectively done the ALJ's work for him? And is there any point in sending this back now? I think any district judge would have been justified in saying, this doesn't cut it under Burgess, go back and do this again. I don't think a district judge or the circuit is required to go do a searching review of the record and do the ALJ's work for him or her. But where it's been done, I mean, is there any point in sending this back? Well, I would argue, Your Honor, and I agree with you, by the way, I certainly do not believe that the district court has an obligation to fix the ALJ's mistakes, if there are any. But don't forget that Judge Kogan would have been working with, I think, some of the same flawed information and material we have, or may have overlooked something. For example, maybe he tried to fill in the blanks. He tried to find, I guess, fixes for the response. But to the extent that, for example, Dr. Gordon's report was based on a reading of Dr. That's important because that would, I would believe, I would maintain that that would almost result in that opinion being ignored. I don't know if Judge Kogan used that. I have to look back through his opinion to see if he relied on that at all. But I think there are maybe, there's factual information, some other stuff that happened that we're all talking about that Judge Kogan would have also been working with that is somehow flawed, inaccurate, incomplete. So maybe he has the ability to do it. I don't think he has an obligation. The panel feels the same way about that. I'm not sure he fixed it. And to the extent that he tried to fix it, he may have easily been relying on misinformation. All right. Thank you. We will not let the case be remanded. Thank you. Thank you very much. Thank you both for your arguments. We'll reserve decision. That concludes our oral argument calendar. Today we have one case, Diaz Carranza versus Garland that is on submission. And that's number 2011-23. The clerk will please adjourn court. Court stands adjourned.